**ROGER T. NUTTALL   #42500**
**NUTTALL, COLEMAN AND DRANDELL**
2333 Merced Street
Fresno, Ca 93721
PHONE: (559) 233-2900
FAX: (559) 485-3852

**W. SCOTT QUINLAN, 101269**
Attorney at Law
2333 Merced Street
Fresno, Ca 93721
PHONE: (559) 442-0634
FAX: (559) 233-6947

Attorneys for Defendant

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        v.<br><br>MARK REYNOLDS,<br><br>                    Defendant. | No.  1:16-CR-00081 LJO-SKO<br><br>**DEFENDANT MARK REYNOLDS' FORMAL OBJECTIONS TO PRESENTENCE REPORT AND MOTION FOR DOWNWARD DEPARTURE AND/OR VARIANCE** |

Defendant Mark Reynolds moves for a departure and/or variance downward and submits the following objections to the Presentence Report. He requests an evidentiary hearing to address the matters set forth herein.

## INTRODUCTION

Defendant Mark Reynolds has provided to Probation documents to support and explain his position regarding the facts of his case. He also provided Probation with the amendments to the guidelines as to "intended loss", first proposed in 2015 and adopted and carried into the November 2016 guidelines being used in this case.

1

In responding to defendant's informal objections, Probation represents that, "The presentence report is not utilizing a proposed 2015 amendment to determine loss. Therefore, there will be no revision to the presentence report in this matter." (Doc. 54-4 Probation Response to Informal Objections, page 2). Probation overlooks the change in the definition of intended loss from an objective test to a subjective test. That change is now set forth at U.S.S.G. 2B1.1 Application Note 3(A)(ii) at page 95 of the 2016 edition of the guidelines. The Sentencing Commission adopted the subjective intent reasoning of <u>United States v. Manatau</u> (10th Cir., 2011) 647 F.3d 1048 (See attached January 16, 2015 Proposed Amendments at pages 73-74). Pertinent to our case, the Commission rejected an "objective financial risk to victims" standard and an "objectively reasonable expectation of a person in defendant's position at the time he perpetrated the fraud" standard to ascertain intended loss under the guidelines (<u>id</u>).

Probation errs in representing there was an "actual loss". An actual loss is defined as a reasonably foreseeable pecuniary harm **that resulted** from the offense (2B1.1, Application Note 3(A)(i)). Probation identifies no harm that any victim suffered because there was none. As detailed herein, the money at issue was on deposit at the request of and for the benefit of Ben-E-Lect employer clients for their employees, to be used to pay medical bills. No medical bill went unpaid. If an employer client wished to close his account with Ben-E-Lect or transfer his or his employee's funds to another company, it did so. No company or company employee was deprived the use of funds, or the funds. The facts in support of these representations were begrudgingly acknowledged by Probation in its response to defendant's informal objections, wherein Probation stated:

"It is fortunate that no member ever had a claim that was not properly addressed and not reimbursed timely" . . . It is fortunate that employers received all funds when they cancelled their administrative agreements." (Doc. 54-4, page 4).

The lack of any loss is further reflected in the Probation Report wherein it is stated that no completed victim impact statement was received from the Victim Witness Coordinator with the United States Attorney's Office (Doc. 54, Presentence Report, page 6, paragraph 19). No

restitution has been recommended by Probation and the account at issue has been fully funded as of February 28, 2018, when the last of the funds borrowed was repaid (Doc. 54, Presentence Report, page 7, paragraph 19).

Before addressing the particulars of the case and of the representations in the Presentence Report, defendant contends that there is a second major error in the report. The defense provided Probation with the attached California Superior Court Amended Judgement and Second Amended Statement of Facts, finding for Ben-E-Lect against Anthem Blue Cross for Cartwright Act and Unfair Competition violations in the total sum, including fees and costs, of $7,772,597.

Defendant contends that his actions in this case were motivated by his desire to keep his company going and to prevent layoffs in the face of the unlawful restraint of trade practices found to have been engaged in by Anthem Blue Cross. Defendant contends that these factors, coupled with his repaying all sums borrowed as soon as he could, take his case outside of the heartland of cases involving conversion of funds.

Probation, in addressing this Anthem Blue Cross judgement, has discounted it by claiming that it addressed only periods between 2011 and 2015 (Doc. 54-4, Response to Informal Objections, at page 3).

The action was filed in 2015, and so could only go back four years due to the statute of limitations (California Business and Professions Code §§16750.1 and 17208). Completely overlooked by Probation are the following findings of the trial judge set forth in the Second Amended Statement of Facts at pages 3:20-25, and 9:22-28, as follows:

"Beginning in 2006, Anthem prohibited its agents from selling wrapped products to employees in conjunction with certain Anthem plans. This anti-wrapping policy first allowed wrapping of EPO Plans sold to small groups, and then, after 2010, allowed wrapping of Elements plans sold to small groups until January of 2014, when Anthem prohibited all agents selling Anthem products from selling an HRA in conjunction with an Anthem health insurance policy.

*                              *                              *

///

3

Anthem makes three general arguments against a damage award. First, Anthem argues that Ben-E-Lect was not a viable business with or without the anti-wrapping policy. This argument is at best circular. Anthem's policy was a substantial factor in decreasing Ben-E-Lect's viability.

**Had Ben-E-Lect been able to sell its product without restriction, it might well have remained profitable without the improper transfers of funds from employer loss accounts into Ben-E-Lect's operating accounts.**" (Emphasis added).

As set forth herein, this ground for departure and for a variance has been overlooked by Probation.

### THE ORIGINAL AND SUPERSEDING CHARGES

The original indictment alleged three different crimes. Count One alleged a violation of 18 U.S.C. §669, which punished embezzlement of health care plan funds. As pled, the government was not going to prevail on that count because the funds were not health care plan funds; they were employer funds controlled by the employer's agent Ben-E-Lect (United States v. Gibbs (9th Cir., 1983) 704 F.2d 464, 465-466; United States v. Garcia-Pastrano (1st Cir., 2009) 584 F.3d 351, 370-371, 375).

Counts 2-15 alleged mail fraud by mailing false account balance statements to clients. As a purely technical matter, counts 2, 5, 6, 7, 8, 9, 11, 13, 14 and 15 involved statements that were not mailed; they were faxed or e-mailed. More to the point, all of the monthly statements addressed the target amount each employer agreed to keep on deposit when he signed up with Ben-E-Lect, and the amount to be replenished after payment of itemized medical expenses for that employer's employees for that month. From Ben-E-Lect's inception, they were historically transmitted by mail or e-mail to all clients' and were accurate as to the target account balance and the medical expenses paid. They were not part of the execution of a scheme as conceived by the defendant at the time of the transmittal (Schmuck v. United States (1989) 489 U.S. 705, 715).

Nor was the government going to prevail on its money laundering charges alleged as counts 16-20. Those charges pertained to the type of money-laundering that it could not prove by

4

ordinary bank transfers because financial transactions that are easily traceable are not ordinarily considered to be money-laundering designed to conceal the nature, location, source, ownership or control of the funds (Regalado Cuellar v. United States (2008) 553 U.S. 550, 568-569; United States v. Esterman (7th Cir., 2003) 324 F.3d 565, 572-573). Further, because each financial transaction was central to the alleged scheme to defraud by use of the mail (it was how the claimed embezzlement took place), it could not also comprise money-laundering (United States v. Van Alstyne (9th Cir., 2009) 584 F.3d 803, 814-816; United States v. Wilkes (9th Cir., 2011) 662 F.3d 524, 545-546).

All of this was conveyed to government counsel during the jury instruction conference (except we did not inform them that most of their mail fraud counts did not involve the use of the mail).

The government then proposed that the defendant plead to a superseding information alleging conversion of ERISA funds, a violation of 18 U.S.C. §664. In doing so, the government did not realize that ERISA funds exclude by statute HRA funds.

## FLEXIBLE SPENDING ACCOUNT FUNDS WERE THE ONLY ERISA FUNDS HELD BY DEFENDANT AND WERE RECONCILED EVERY YEAR

Defendant submits that the ERISA funds applicable to the count of conviction should be first determined before attempting to ascertain "relevant conduct" to that count of conviction.

There were two types of funds held by Ben-E-Lect for its employer clients. The first were HRA funds which are Health Reimbursement Arrangement funds. These are employer funds deposited by Ben-E-Lect to the 229 account Ben-E-Lect had set up for its employer clients, which Ben-E-Lect agreed to manage as the employer's agent.

The second type of funds comprise one percent or less of the 229 account balance. They are FSA funds or Flexible Spending Account funds collected from employee contributions in whole or in part by the employer to be held in an account for the use of employee medical expenses or child care. Any unused amount in the employee FSA account was remitted to the

employer, not to the employee, at the end of the plan year. This was a "use it or lose it" account that was, by its terms, reconciled every year.

Both types of funds were held by Ben-E-Lect in its "229" account when the employer paid into the account electronically. Because there were only a few employers who paid FSA amounts this way, the average FSA funds held in the 229 account in a given month was $25,000.

The significance of this is that an ERISA employee welfare benefit plan by definition excludes HRA funds. The crime set forth in 18 U.S.C. §664 defines "employee welfare benefit plan" as any such plan subject to any provision of Title I of ERISA.  29 U.S.C. §1191 b(a)(1) is a provision of Title I which specifically exempts HRAs from the definition of an ERISA "employee welfare benefit plan" if it meets the requirements of 26 U.S.C. §9831(d)(2) as follows:

> "The term "group health plan" means an employee welfare benefit plan to the extent that the plan provides medical care (as defined in paragraph (2) and including items and services paid for as medical care) to employees or their dependents (as defined under the terms of the plan) directly or through insurance, reimbursement, or otherwise. Such term shall not include any qualified small employer health reimbursement arrangement (as defined in section 9831(d)(2) of Title 26)."

26 U.S.C. §9831(d)(2) sets forth HRA requirements. To qualify the following requirements must be met:

> "**(2) Qualified small employer health reimbursement arrangement.** - - For purposes of this subsection—
>
> **(A) In general.** - - The term "qualified small employer health reimbursement arrangement" means an arrangement which - -
>
> **(i)** is described in subparagraph (B), and
>
> **(ii)** is provided on the same terms to all eligible employees of the eligible employer.
>
> **(B) Arrangement described**. - - An arrangement is described in this subparagraph if –
>
> **(i)** such arrangement is funded solely by an eligible employer and no salary reduction contributions may be made under such arrangement,

6

**(ii)** such arrangement provides, after the employee provides proof of coverage, for the payment of, or reimbursement of, an eligible employee for expenses for medical care (as defined in section 213(d)) incurred by the eligible employee or the eligible employee's family members (as determined under the terms of the arrangement), and

**(iii)** the amount of payments and reimbursements described in clause (ii) for any year do not exceed $4,950 ($10,000 in the case of an arrangement that also provides for payments or reimbursements for family members of the employee)."

HRA funds thus do not fall within the provisions of 18 U.S.C. §664. The funds that defendant converted in violation of 18 U.S.C. §664 are FSA funds, reconciled and remitted to the employer every year.[1]

The defense previously provided to Probation by cover letter of May 24, 2018 the April 12, 2012 letter to customer T.B. showing the account balance of the FSA account at end of plan year, and the amount of refund owed the employer. Page two is a copy of the check for the refund amounts identified. The FSA accounts were reconciled every year and any balance was remitted to the employer. The defense provided Probation with a balance summary of each month in 2012 of the FSA deposits by all employers, as well as a summary of all FSA deposits in January for the years 2011-2017. The maximum balance of FSA funds did not exceed $30,075.19 during any year during the time period of the superseding information. The maximum that defendant could have converted from the FSA accounts in 2013 and 2014 would be approximately $43,916 total. All other FSA account balances had been reconciled and remitted yearly to the employer before the claimed discovery of any crime on October 8, 2013, when defendant's activities were first reported to law enforcement. Because prior FSA account amounts had been reconciled at the end of each plan year, any converted amounts for earlier years would have been paid to the employer

///

---

[1] Another way to look at this issue is that the funds held in the 229 account that were not FSA funds were employer funds and not ERISA plan assets (Cline v. Industrial Maintenance Engineering and Contracting Co. (9th Cir., 2000) 200 F.3d 1223 at 1234; United States v Gibbs (9th Cir., 1983) 704 F2d 464, 465-466; United States v. Garcia-Pastrano (1st Cir., 2009) 584 F.3d 351, 370-371, 375).

before discovery by law enforcement, and the FSA account balance would again start at zero at the beginning of the new plan year.

Thus, employers whose plan years ended before October 2013 would have had their employee's FSA account reconciled and zeroed out so that any prior conversions by defendant would not count toward a loss (2B1.1 Application Note 3(E)(i)).

As noted previously, even after FSA account amounts were converted in 2013 or 2014, no individual's medical bill was not timely paid. Further, if the FSA account was closed by the employer, he was promptly paid all sums held in the account, minus agreed upon administrative fees.

The probation report does not address these matters, preferring to lump everything together as "relevant conduct" (Doc. 54-4, Response to informal objections at page 2).

**CLAIMED RELEVANT CONDUCT**

Relevant conduct is defined in U.S.S.G. 1B1.3(a)(1)(A)(2)(3). It is contended by the government that misuse of employer HRA funds in violation of state laws is relevant conduct to misuse of FSA funds under federal law.

Defendant pled guilty to conversion of the assets of an Employee Benefit Plan. As noted above, the assets of the FSA account are ERISA Employee Benefit Plan Funds that are reconciled and disbursed to the employer at the end of each plan year. Thereafter each FSA plan starts anew with a zero balance. There was no fund loss when the account was reconciled, and the balance returned to zero. Relevant conduct to the crime of conversion of Employee Benefit Plan funds would be for the years of conviction for that conversion, i.e. May 30, 2013 to March 28, 2014. Further, under California law repayment of HRA sums taken prior to charges of embezzlement being brought is grounds for mitigation (California Penal Code §513). Here, the 229 account holding HRA and FSA funds had been reconciled and balanced before the superseding information was filed.

Defendant disputes that alleged conversion of HRA funds under state law is relevant conduct, disputes the amount of such funds, and the time periods involved and disputes the

1   amount of any loss. The government bears the burden of proof on these issues by clear and

2   convincing evidence (United States v. Hymas (9th Cir., 2015) 780 F.3d 1285 at 1292).

3                                    **THERE IS NO LOSS**

4           Defendant's misuse of funds held by the employer clients of Ben-E-Lect, or the

5   employees of employer clients, did not cause any actual loss of use of money, or loss of money.

6           The facts are that money was held in the Ben-E-Lect account designated as the 229

7   account. The money, whether HRA or FSA funds, was deposited to pay or reimburse medical

8   expenses of clients' employees that were incurred that were within the deductible amount of the

9   employer policies covering their employees.

10          The insurance company would process the medical bills received and determine if they

11  were covered by the policy and whether they fell within the deductible. If the answer to both

12  questions was yes, the insurance company would not pay. Instead, Ben-E-Lect would process the

13  bill for payment, as it was already determined to be covered by the policy, and pay the bill, or

14  reimburse the employee from sums on deposit in the 229 account.

15          No medical expense, which the 229 account was set up to pay from, ever went unpaid.

16  From time to time and upon defendant's indictment, clients moved their funds out of the 229

17  account and closed their account with Ben-E-Lect. All clients who did so received their funds on

18  deposit minus agreed administrative fees. No client was deprived of the use of their money, and

19  all received back funds on deposit upon request. As acknowledged in the presentence report all

20  funds were returned to the 229 account, and it was balanced.

21

22          **THERE WAS NO ACTUAL OR INTENDED LOSS AND NO "VICTIM"**

23          Regardless of whether HRA or FSA funds were misused, there was no "loss". The

24  government's analysis of whether or not there has been a "loss" is based upon the law as it

25  existed before the 2015 amendment to the guidelines. Specifically, the Sentencing Commission in

26  2015 adopted the reasoning set forth in United States v. Manatau (10th Cir., 2011) 647 F.3d 1048,

27  ///

28  ///

holding that "intended loss" contemplates "a loss the defendant purposely sought to inflict," and that the appropriate standard was one of "subjective intent to cause the loss".[2]

This change in the definition of "intended loss" went into effect in the November 1, 2015 guidelines, and can be found at Application Note 3(A)(ii) at page 89 of that guidelines manual (page 83 of the 2016 manual).

In 2014 "intended loss" was defined as the pecuniary harm that was intended to result from the offense (2014 guidelines manual, U.S.S.G. 2B1.1 Application Note 3(A)(ii)). Without the subjective component that is now a part of the definition of "intended loss", defendant could have been found, using the 2014 guideline, to have intended a loss "based upon the objectively reasonable expectation of a person in his position at the time he perpetrated the fraud", or upon the "objective financial risk to victims caused by that conduct" (United States v. Inarelli (1st Cir., 2008) 524 F.3d 286, 291; United States v. Lane (7th Cir., 2003) 323 F.3d 568, 590). These tests for "intended loss" were specifically rejected by the Sentencing Commission, as detailed in the January 16, 2015 Proposed Amendments to the Sentencing Guidelines at page 73.

"Actual loss" is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense." (U.S.S.G. 2B1.1 Application Note 3(A)(i)). "Pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money (ibid, Application Note 3(A)(iii)). "Reasonably foreseeable pecuniary harm" means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known was a potential result of the offense (ibid, Application Note 3(A)(iv)).

"Risk of harm", which includes risk of monetary loss, is not to be treated as the equivalent of harm that occurred in determining relevant offense conduct and adjustments. This is set forth in U.S.S.G. 1B1.3(a)(3) and Application Note 6(A)(B).

The government cites no case substituting "risk of loss" or "potential loss" for "actual loss" arising in the trial court after the November 2015 guideline amendment. Nor can the government use "gain to the defendant" in the absence of a loss (United States v. Joseph (10th

---

[2] A copy of relevant portions of the Proposed Amendment of January 16, 2015 was provided previously. The Commission reference is to pages 73-74 of that Proposed Amendment.

Cir., 2017) 705 Fed.Appx. 711, at 717, unpublished; U.S.S.G. 2B1.1 (2016 Ed.) Application Note 3(B)).

The facts of this case are unusual. Defendant neither intended to cause nor did his actions cause a loss to any Ben-E-Lect client. Defendant initially repaid sums borrowed but fell behind. This occurred in 2008-2009. There followed a period during which defendant was unable to make any repayments. Defendant kept track of all money going out of and into the 229 account. No bill, which the money was to be used to pay, went unpaid. All clients who closed their accounts with Ben-E-Lect received back their deposited sums. The fund is now fully funded.

"Victim" is defined in U.S.S.G. §2B1.1 Application Note 1. "Victim" means (A) any person who sustained any part of the actual loss determined under subsection (b)(1)." None of Ben-E-Lect's client companies, or anyone else, suffered an "actual loss", defined above. In the abstract, the fund was deprived of the temporary use of its FSA funds. However, the fund was able to pay any bill it was required to pay, and paid all such bills.

Courts addressing situations where there is no loss in fact have resorted to very substantial departures downward.

## SPECIFIC OBJECTIONS TO THE PRESENTENCE REPORT

**Page 3**

Defendant objects to the offense level determination of 27 wherever it appears, for reasons set forth above. Further, as noted in the guidelines, risk of monetary loss is already taken into account in the base offense level (U.S.S.G. 1B1.3 Application Note 6(B) referring to relevant conduct "harm").

For reasons set forth hereinabove, defendant objects to the 60 month sentence recommendation wherever it appears.

**Page 4**

**Paragraph 5**

Defendant objects to paragraph 5, the second sentence, as it reflects a basic misunderstanding of Ben-E-Lect's role and of the nature of the funds in the 229 account. Ben-E-

11

Lect did not adjust or settle claims. Nor did it collect premiums in relation to the 229 account. Defendant provided samples of its agreements to support its position to Probation. Probation declines to change its position (Doc. 54-4, page 4).

**Paragraph 6**

Defendant objects to the suggestion in paragraph 6 that all funds in the 229 account were ERISA funds. As set forth above, less than one percent of such funds were ERISA funds, and those funds were reconciled yearly with any excess fund remaining being remitted to the employer. Defendant further objects to the reference to California law, as civil trust law is irrelevant.

**Paragraph 7**

Defendant objects to paragraph 7 insofar as it represents that the complaint of defendant's conduct was received in December 2013. It was received on October 8, 2013. In an HRA Ben-E-Lect clients paid out of their own pockets for medical expenses incurred by employees that were covered by the group plan but fell within the deductible such that the carrier was not responsible for it. In an FSA, employees of clients set aside tax free money to be used for medical expenses within the deductible, with any sum left over at the end of the plan year being forfeited to the employer.

**Page 5**

**Paragraph 10**

Defendant objects to paragraph 10 insofar as it sets forth that defendant intended to defraud anyone. He further objects to any claim that he embezzled or stole money, specifically HRA money. Defendant neither intended to defraud, embezzle nor steal. He also objects to the time period set forth therein as beyond the charge he pled to and as not encompassing relevant conduct to his count of conviction. Defendant acknowledges that he converted and misused FSA funds from May 2013 to March 2014 which were reconciled annually. Defendant admits that he took his salary and a draw from the corporation and spent those sums on personal items.[3]

---

[3] Probation claimed in its Response to Informal Objections that its position was supported, as to all of these objections, by "discovery" (Doc. 54-4).

12

**Paragraph 11**

Defendant objects to paragraph 11. These bank transfers were to business operating accounts which were traditionally used to pay business related bills and commissions, as well as salaries of employees, including defendant. His salary and draw was deposited by Ben-E-Lect to his bank account. None of these bank transfers were done with intent to conceal or disguise anything. The transfers were above-board, tracked on two reports, and easily traceable.

**Paragraph 12**

Defendant objects to paragraph 12 and to the sums set forth therein. The account has been reimbursed and the actual loss is zero. Further, only FSA sums, reconciled annually, for the years 2013-2014 are at issue. All prior FSA account sums had been reconciled before the crime is alleged to have been discovered and so would not be part of a loss computation under 2B1.1 Application Note 3(E)(i). All other funds and years are disputed.

**Paragraph 13**

Defendant objects to the multiple hearsay statements set forth in paragraph 13 as unreliable.

**Page 6**

**Paragraph 14**

Defendant objects to paragraph 14 insofar as it suggests that the replenishment letter was to set forth the money in the 229 account. The replenishment letter accurately set forth medical payments made for each employee for that month in a sum certain, with supporting documentation, and requested that exact sum be paid to maintain the agreed target amount to be deposited. Defendant further objects to Clifft's foundationless belief as to the amount of money believed to be missing.

**Paragraph 15**

Defendant objects to all of the conclusions set forth at paragraph 15, including a belief that there is an actual loss, and the amount of such loss. Defendant further disputes that there are victims and that he stole money. Stealing requires an intent to permanently deprive people of their money. A victim is someone who suffers an actual loss (2B1.1 Application Note 1).

13

1     **Paragraph 16**

2         Defendant objects to the conclusions in paragraph 16. Defendant did not transfer money

3 multiple times between bank accounts before applying the funds to expenses or transferring the

4 funds out of the company. These transfers were directly to business operating accounts which

5 were then used to pay business related bills and commissions and salaries of employees, including

6 defendant. His salary and draw was deposited by Ben-E-Lect to his bank account. None of these

7 transfers were done with intent to conceal or disguise anything. The transfers were above-board,

8 tracked on two reports, and easily traceable.

9         Further, the report sets forth that defendant knew no one else would look at the account,

10 and then accuses him of making false entries to disguise the use of the funds. It is a <u>non</u> <u>sequitur</u>

11 that defendant disguised the use of the funds from himself.  That is a theory advanced by the

12 prosecution and adopted by Probation. It should be noted that defendant is not accused of failing

13 to pay any tax owed.

14     **Paragraph 19**

15         Defendant objects to the representation that defendant "stole" at paragraph 19. He did not

16 intend to permanently deprive anyone of their money; nor did he intend to deprive anyone of the

17 use of their money.

18 **Page 7**

19     **Paragraph 22**

20         Defendant objects to the truncated and misleading statements attributed to him at

21 paragraph 22. Ben-E-Lect billed employers (not employees) monthly for services Ben-E-Lect

22 provided. Payroll was $300,000 to $350,000 per month. Rent was around $25,000 per month.

23 Defendant made transfers from the 229 account to cover part of the payroll, rent and other

24 expenses. He kept a detailed spreadsheet of every dollar that went into and out of the 229 account.

25 The money was paid back from the net profit of the company and from net gains generated by the

26 sale of new products developed in 2010, 2011 and 2012. Part of repayment was from the sale of

27 ///

28 ///

assets. From net operating costs defendant paid approximately $50,000 to $75,000 per month pursuant to an amortization schedule put in place. The 229 account was balanced ahead of time in February 2018.

**Paragraph 23**

Paragraph 23 should be corrected to state "the money **for** payroll was used to keep the business going".

**Page 8**

**Paragraph 26**

Defendant agrees that the base offense level is 6 as set forth at paragraph 26.

**Paragraph 27**

Defendant objects to the loss calculation and to the 18 level increase set forth at paragraph 27. He submits that there is no actual or intended loss, and that "risk of loss" is built into the base offense level pursuant to 1B1.3 Application Note 6(B).

**Paragraph 28**

Defendant objects to the 2 level increase for 10 or more victims set forth in paragraph 28. Victims must suffer actual loss.

**Paragraph 29**

Defendant objects to the 2 level increase for sophisticated means set forth in paragraph 29. Ordinary bank transfers in the normal course of business are not sophisticated. Nor did he commingle to conceal, disguise, etc. the funds. Nor did he make false entries in books that only he would review so as to conceal the use of the funds.

**Paragraph 31**

Defendant objects to the abuse of position of trust 2 level increase in paragraph 31. Abuse of trust is built into the crime he was convicted of. Defendant is not a fiduciary of the benefit plan because he has no discretionary authority over plan assets (29 U.S.C. §1002(21)(A)). Defendant's company is an agent for processing claims only. As set forth in the HRA plan documents sent to Probation by cover letter dated May 24, 2018, the employer is the plan sponsor and plan administrator and retains the authority and responsibility for the Plan, its operation, and for Plan

Benefit claims (paragraphs 4 and 7 of Administrative Services Agreement). As set forth in the FSA application sent to Probation on May 24, 2018, the FSA plan administrator is the Employer who is also the named fiduciary under the plan. Defendant is not a plan fiduciary such that the abuse of trust enhancement would apply. His actions were not independent of the acts of conversion he pled to.

Defendant submits that his base offense level should be 6. If it is determined that he abused a position of trust, 2 levels would be added. Defendant would receive a 2 level reduction for acceptance of responsibility. His total offense level would be 6 with a criminal history category of I. Defendant's guideline range would be 0-6 months in Zone A, warranting probation pursuant to 5B1.1.

**ADDITIONAL OBJECTIONS**

It is important that defendant stress that he has no ownership interest whatsoever in Employer Driven Insurance Services, Inc., contrary to what is set forth at page 15 of the PSR.

It is also noteworthy that Probation reports defendant's cash flow without consideration of taxes he will owe.

At page 22, condition 6 and 7, and page 24, condition 7, defendant objects to any restriction on employment and to employment training. He also objects to a requirement that he work 30 hours per week. Defendant will be 63 years old on October 11, 2018. He would like to engage in some kind of work, perhaps consulting on a part-time basis. He has worked all of his life and built up Ben-E-Lect and is on the cusp of retirement. He should not be prohibited from being self-employed. Due to his age and financial stability, defendant submits that no minimum work hours per week should be imposed.

**WARRANTED DEPARTURES/VARIANCES**

Contrary to the PSR representation that there are no known grounds for departure or variance, there are several known grounds to depart/vary downward substantially.

///

## A.     No Criminal History Whatsoever

Mr. Reynolds has no criminal history whatsoever. Probation recognizes this as a ground for a lesser sentence. As has been set forth by probation previously in the Presentence Report in United States v. Dunbar 1:16-cr-00151 DAD at Doc. 69:

> "Significantly, the defendant has no known prior criminal convictions or arrests.   While this is considered by the Guidelines Manual as a criminal history category I, this category also includes someone with 1 criminal history point which indicates some form of prior criminal involvement. In regard to this defendant, [her] apparent lack of involvement in the criminal justice system is a significant factor to consider. The difference between zero criminal history points and 1 criminal history point is also noted in a March 2017 United States Sentencing Commission report titled, *The Past predicts the Future: Criminal History and Recidivism of Federal Offenders* regarding recidivism among a group of 25,431 federal offenders released from prison, or placed on probation, in the year 2005   (http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf ).
>
> According to the report's key findings noted on page 6, criminal history score and category are strong predictors of recidivism. Additionally, offenders with zero criminal history points had a lower re-arrest rate than offenders with one criminal history point (30.2% to 46.9%), a slightly longer median time to re-arrest (27 months to 25 months), and less serious re-arrest offenses. The research also found differences in recidivism rates among offenders with zero criminal history points. Offenders with zero points and no prior contact with the criminal justice system have a lower recidivism rate (25.7%) than offenders with zero points but some prior contact with the criminal justice system (37.4%)."

The December 9, 2016 proposed amendments to the guidelines at §4C1.1 recognize the need for a category for first offenders who have never had a criminal conviction of any kind. Such people should have a decreased offense level (page 4). After expanding Zone B to

encompass Zone C, the proposed guideline also recommends a sentence other than imprisonment for such first offenders, if they are in Zones A or B (page 6). Mr. Reynolds has no prior arrests and falls within the policies warranting a lesser sentence because of it. The PSR should reflect this.

The current guidelines do not address the difference in recidivism of individuals who have never been convicted in their life, and those who have been convicted but whose convictions do not count for one reason or another.

Probation's response to this issue does not address the difference in recidivism or the contention that those who have never suffered a conviction should receive more lenient treatment (Doc. 54-4, Response to Informal Objections at page 3).

**B.    The Offense Was Outside The Heartland Of Such Offenses As Defendant's Motivation Was To Keep His Business Viable In The Face Of Proven Anti-Competitive Acts Of Anthem Blue Cross**

As noted previously, the defense provided to Probation a copy of the judgment against Anthem Blue Cross awarding a total of $7,772,597 to Ben-E-Lect for injury to its business caused by the anti-competitive actions of Anthem Blue Cross. Anthem was enjoined from further threatening health insurance brokers to prevent them from doing business with Ben-E-Lect.

We have provided to Probation e-mail from the person handling payroll and other business expenses asking defendant for funds to pay business expenses that coincide with defendant's transfer from the 229 account to meet those financial business obligations.

Poor decisions by small business owners falling on hard economic times beyond their control warrant a substantial reduction in sentence by departure (United States v. Suarez-Reyes (DC Nebraska 2012) 2012 WL 6597814 at 7-8. In that case the defendant made extraordinary efforts at restitution, was in poor health, and his poor business decisions led a bank to lose $693,000 due to his check kiting. The defendant was sentenced to one day incarceration (page 7).

In United States v. Heine (DC Oregon, 2018) 2018 WL 2986212 (Slip opinion) the defendants concealed and misrepresented the poor financial condition of the bank of which they

18

were officers. When defendants' actions became public the bank became insolvent and closed. Both defendants benefitted in the amount of their salaries while the bank remained open due to their fraud. After adjustments, defendant Heine's offense level was 31 and defendant Yates offense level was 29. Because both defendants primarily sought to hide the bank's financial problems, keep their jobs, and improve the bank's financial attractiveness to potential investors or acquirers, a substantial variance down was allowed from 108-135 months to 24 months, and from 87-108 months to 18 months. These motivations were not typical of bank fraud.

Defendant admittedly made the wrong choice in deciding to transfer money from the 229 account. He was, until he chose that wrong decision, an exemplary citizen. That decision is unique to the situation defendant was in and would never recur. Nor would Mr. Reynolds, if faced with a similar choice, repeat his mistake. He has acknowledged it is wrong and has already suffered the catastrophic consequences of his actions.

As noted previously, Probation's response to this contention is to erroneously characterize the conduct of Anthem Blue Cross as only pertaining to a time period after defendant began misappropriating funds i.e. 2008 and after. However, as the Superior Court judge noted in his statement of facts:

"10. EFFECT OF ANTI-WRAPPING POLICY

Anthem's anti-wrapping policy, and its coercion of its agents in obeying that policy have had a substantial detrimental effect on Ben-E-Lect's ability to market its product.

11. DAMAGES

Anthem makes three general arguments against a damage award. First, Anthem argues that Ben-E-Lect was not a viable business with or without the anti-wrapping policy. This argument is at best circular. Anthem's policy was a substantial factor in decreasing Ben-E-Lect's viability.

Had Ben-E-Lect been able to sell its product without restriction, it might well have remained profitable without the improper transfers of funds from employer loss accounts into Ben-E-Lect's operating accounts."

19

The effect of Anthem Blue Cross' anti-competitive conduct has been mischaracterized and overlooked by Probation. Pursuant to the above-cited cases, a substantial departure/variance downward is warranted because defendant's motivation was not typical of cases involving conversion, theft, or embezzlement.

**C.      Defendant Has Suffered Significant Punishment For His Actions Already**

The PSR notes that defendant's professional licenses were suspended by the California Department of Insurance. Defendant can no longer engage in the business of insurance he has been involved in for 33 years. He is not allowed to consult, give advice, work with any insurance entity, nor advise any individual on insurance matters for the remainder of his life. He has been removed from his office and employment with Ben-E-Lect, the company he built (page 12, paragraph 67). That company is no longer doing business. Its assets have been sold. He has been forced to put his shares of Ben-E-Lect in a voting trust. This punishment is a direct result of his actions for which he has been prosecuted in this case.

The fact that defendant has been punished by authorities in other ways for his conduct is a grounds for departure/variance pursuant to United States v. Clough (9th Cir., 2004) 360 F.3d 967 at 970.

Probation addresses this argument by stating that defendant will earn money from the sale of his company (Doc. 54-4 at page 3). It ignores the fact that defendant was forced to sell his company because he has been barred from operating it as punishment for his actions.

**D.      Defendant Has Made Extraordinary Restitution**

Courts that have addressed the issue have found extraordinary efforts at restitution to warrant an extreme departure down. This is particularly true when the restitution results in no actual loss to any victim. That is precisely the situation in this case. The defense provided Probation with a summary of the 229 account balance showing the amount of, and dates of repayments made, and concluding with the account being balanced before the instant superseding

///

information was ever filed. In balancing the account, defendant sold his home, cashed in investments, and took other steps to ensure payments were made.

Probation is also aware of the plea agreement wherein defendant agreed to pay a fine of $220,971.11, nearly $95,000 more than the maximum guideline fine (PSR page 17, par. 84).

The extraordinary efforts to repay all sums borrowed (converted) by defendant ensured that no person or entity suffered an actual loss. This warrants an extreme departure.

Probation addresses this argument by asserting that this was ordinary restitution that does not warrant departure. Defendant submits that he has made exceptional efforts to make full restitution. He sold his home, cashed in investments, and sued Anthem Blue Cross and obtained a judgment for $7 million plus. As noted in the payment schedule provided Probation, $850,000 was repaid on February 22, 2018. This sum was borrowed on that judgment. Even under 5K2.0(d)(5), cited by Probation, departure for restitution is allowed where the restitution is based on exceptional efforts to remedy the harm caused by the offense.

In United States v. Oligmueller (8th Cir., 1999) 198 F.3d 669 the defendant obtained a loan for $829,000 based upon a fraudulent loan application. Only $65,000 was recovered from the sale of the pledged assets. The intended loss was zero because the defendant had intended to pay the loan back. (This case is cited by the Sentencing Commission as the test to use for "intended loss" determinations). By the time of sentencing the defendant had paid back all but $58,000. The trial court determined the $58,000 to be the actual loss. The appellate court affirmed on the grounds that a downward departure to the actual amount remaining to be paid at time of sentencing was warranted. It affirmed sentencing based upon the $58,000 loss figure and held that cases can fall outside the heartland when there are extraordinary efforts at restitution (pages 671-672).

Here, defendant has made exceptional efforts to ensure that no harm befell any client or employee of any client.

Departures downward are also authorized in cases where the actual loss is overstated (U.S.S.G. 2B1.1 Application Note 20(C)).

///

In <u>United States v. Broderson</u> (2nd Cir., 1995) 67 F.3d 452, at 459 departure was warranted because the government had recovered $3.3 million and thus had suffered no loss. The appellate court affirmed the trial court conclusion that this confluence of circumstances was not taken into account by the Guidelines, and that the loss calculation overstated the seriousness of the offense. The defendant had been sentenced to 18 months when the guideline range was 41 to 51 months (page 455). Even then, the case was reversed for resentencing because the trial court had overstated the computed initial loss and should not have applied an abuse of position of trust enhancement (pages 459-460).

Probation does not address 2B1.1 Application Note 20(C).

## CONCLUSION

Based upon the foregoing, defendant Mark Reynolds respectfully submits that probation would be an appropriate sentence in his case. In the event that the Court determines that some confinement is warranted, he submits that home detention with or without electronic monitoring would be appropriate.

Dated: September 14, 2018

Respectfully submitted,

/s/ W. Scott Quinlan
W. SCOTT QUINLAN, Attorney for
Defendant MARK REYNOLDS